IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

ASH GROVE CEMENT COMPANY                                                    PLAINTIFF

V.                              CASE NO. 4:10-CV-04069

MMR CONSTRUCTORS, INC.                              DEFENDANT/COUNTER PLAINTIFF

V.

MICHAEL COMSTOCK; MICHAEL
BOWLING; DAVID HUGHES;
CONTRACTOR SALES & RENTALS
OF TEXARKANA, LLC; ALTON LOWREY;
SUMMIT ELECTRIC SUPPLY COMPANY, INC.;
and TETON INDUSTRIAL CONSTRUCTION, INC.           THIRD-PARTY DEFENDANTS

**ORDER**

Before the Court is Defendant/Counter Plaintiff MMR Constructors, Inc.'s ("MMR") Motion for Summary Judgment to Enforce Settlement Agreement. (ECF No. 201). Plaintiff Ash Grove Cement Company ("Ash Grove") has responded (ECF No. 213), and MMR has replied. (ECF No. 219). The matter is ripe for the Court's consideration. For the following reasons, the motion will be granted in part and denied in part.

**BACKGROUND**

This case is about a contractual dispute between several parties in a large construction project. Ash Grove contracted with Teton Industrial Construction, Inc. ("Teton") in March 2008 to expand Ash Grove's Foreman, Arkansas cement plant. The project was estimated to cost around $275 million. MMR signed on as Teton's subcontractor a few months later, in May 2008.

1

MMR's job was to do the electrical work on the project. Sometime shortly thereafter, MMR in turn contracted with Contractor Sales and Rentals ("CSR") and Summit Electric Supply ("Summit") to provide materials to MMR for the project. CSR and Summit thus billed MMR, and MMR passed on those charges to Teton, which received payment from Ash Grove.

Sometime in 2009, Ash Grove became suspicious about the prices MMR, CSR, and Summit were invoicing. Ash Grove began an audit and estimated that MMR had passed on between $250,000 and $500,000 in overcharges from CSR. Ash Grove estimated that MMR had also passed on between $1 million and $2.25 million in overcharges from Summit. Ash Grove asked MMR for documentation showing that the charges were legitimate, but had doubts about MMR's figures even after hearing MMR's defense. Because of Ash Grove's suspicion about the charges, it withheld $2.5 million from its October 2009 payment to Teton.[1]

In December 2009, the companies met at Ash Grove's headquarters in Overland Park, Kansas to resolve the impasse. The parties heard one another's arguments, and they agreed on the general outline of a settlement to be finalized in January. Ash Grove, Teton, and MMR executed the settlement agreement on January 25, 2010. The agreement reflects the parties' "desire to resolve the Dispute." (ECF No. 201-1).

"The Dispute" is defined as "[a] dispute…with respect to the amounts paid to MMR for reimbursable costs specifically relating to certain alleged overcharges by MMR on material pricing…." By the agreement, the parties waived any claims against each other that relate to "the Dispute issues discussed at the Meeting." The agreement also acknowledged "that auditing is still ongoing regarding electrical material and equipment quantities invoiced by MMR…and those audits are not affected" by the agreement.

---

[1] MMR and Ash Grove also had a dispute about labor and per-diem rates, but those disputes are not part of this case.

On May 26, 2010, four months after signing the settlement agreement, Ash Grove filed this lawsuit. Ash Grove alleges that MMR conspired with CSR and Summit to defraud Ash Grove by: 1) overbilling for materials actually used; and 2) billing for materials not used at all. The income from the overcharges was used in various ways. Some of the money was used to cover MMR's expenses for non-reimbursable items, effectively letting MMR receive reimbursements to which it was not contractually entitled. The other part of the money was used to enrich the alleged conspirators directly.

MMR contends that this lawsuit is in direct contravention of the settlement agreement. MMR asks the Court to grant summary judgment in its favor on that basis. Ash Grove responds that MMR's fraud, including inducing Ash Grove to sign the agreement in the first place, falls outside the scope of the settlement agreement. Both parties are partially correct.

## STANDARD OF REVIEW

The standard of review for summary judgment is well established. The Federal Rules of Civil Procedure provide that when a party moves for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(a); *Krenik v. County of LeSueur*, 47 F.3d 953 (8th Cir. 1995). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). *See also Agristor Leasing v. Farrow*, 826 F.2d 732 (8th Cir. 1987); *Niagara of Wis. Paper Corp. v. Paper Indus. Union-Mgmt.*

*Pension Fund*, 800 F.2d 742, 746 (8th Cir. 1986). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id*. at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id*. The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik*, 47 F.3d at 957. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256.

## DISCUSSION

The Court must answer three questions to decide MMR's summary-judgment motion: 1) what are the bounds of the settlement agreement; 2) do any of Ash Grove's claims lie inside those bounds; and 3) if any of Ash Grove's claims do lie inside those bounds, is the agreement invalidated by fraud.

### I.     The bounds of the settlement agreement

The first question concerns the bounds of the settlement agreement. The agreement is a contract. Therefore, this Court must first resolve, as a question of law, whether the agreement is ambiguous. *Spann v. Lovett & Co.*, 2012 Ark. App. 107, at 11, ___S.W.3d___,___. If the Court determines that the agreement is not ambiguous, then the Court may also decide its construction and legal effect as a matter of law. *Id.* If, on the other hand, the contract is ambiguous, then the question of its construction and effect is one for a jury to decide.

Contract interpretation is governed by several rules. First, the contract's language should be given "the meaning that the parties intended." *Coleman v. Regions Bank*, 364 Ark. 59, 65, 216 S.W.3d 569, 574 (Ark. 2005); *First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 169, 832 S.W.2d 816, 819 (Ark. 1992). Second, the contract's words should be given their "plain, ordinary meaning." *Griffin*, 310 Ark. at 169, 832 S.W.2d at 819 (quoting *Farm Bureau Mut. Ins. Co. v. Milburn*, 269 Ark. 384, 386, 601 S.W.2d 841, 842 (Ark. 1980)). And third, the contract's clauses should be read harmoniously. *Id.* (quoting *Cont'l Cas. Co. v. Davidson*, 250 Ark. 35, 41, 463 S.W.2d 652, 655 (Ark. 1971)).

The contract in this case is not ambiguous. The settlement agreement relates to the parties' dispute about "the amounts paid to MMR for reimbursable costs specifically relating to certain alleged overcharges by MMR on material pricing." The agreement states that "[t]he Parties conducted an audit and review of the issues surrounding the Dispute, held a meeting on the specific issues relating thereto at Ash Grove's Overland Park, KS offices on December 4, 2009 (the 'meeting') and now desire to resolve the Dispute in accordance with the compromise and settlement described in this Agreement."

As part of the bargain, the parties made mutual concessions that the Court will not specifically relay in this order because the agreement is confidential. The result of the agreement, however, is that the parties waived "any and all claims, causes of action, obligations, duties, liabilities or demands, whether in law or in equity, which relate directly to the Dispute issues discussed at the Meeting and described herein." To gather the meaning of the agreement, then, one must merely know what the "Dispute" and the "Meeting" are.

The agreement defines both. "The Dispute," as noted above, is the issue of "certain alleged overcharges by MMR on material pricing" (and other labor issues not pertinent to this case). "The Meeting" is the parties' gathering on December 4, 2009 at Ash Grove's

5

headquarters. The subject of that meeting was "specific issues" related to "an audit and review of the issues surrounding the Dispute[.]"

On that plain reading, the bounds of the settlement agreement are the material-pricing overcharges by MMR that the parties discussed at the December 4, 2009 meeting. The Court must now ask whether Ash Grove's claims lie inside those bounds.

## II. Whether Ash Grove's claims lie inside the agreement

Ash Grove bases its fraud allegations on two different types of false billing. The first type consists in taking legitimate charges and inflating them. The second type consists in billing for items that were never purchased at all. Ash Grove contends that CSR engaged in both types of false billing, but that Summit engaged only in the first type.

This distinction is important because the settlement agreement applies only to the material-pricing overcharges by MMR that the parties discussed at the December meeting. Thus, the settlement agreement covers Ash Grove's contention that MMR, in concert with CSR and Summit, inflated the prices of legitimate materials. Accordingly, Ash Grove's claims on price inflation in this case are barred by the settlement agreement unless MMR procured the agreement by fraud.

On the other hand, the settlement agreement does not cover Ash Grove's contention that MMR, in concert with CSR, billed for non-existent items. In fact, the agreement specifically noted that MMR's invoices raising *quantity* issues were still being audited, and that "those audits are not affected in any way by this Agreement."[2]

---

[2] MMR argues that only "contractual audit rights" were reserved on the material-quantity issue, and so Ash Grove's general material-quantity claims are covered by the agreement. The agreement itself applies only to "the Dispute," which involves overcharges but not the "material quantity" claims. Ash Grove's material-quantity claims are therefore not covered by the agreement.

6

So, while Ash Grove's material-pricing claims are covered by the settlement agreement, Ash Grove's material-quantity claims are not covered. Those claims may therefore proceed.

### III. Whether MMR induced Ash Grove to sign the agreement by fraud

Ash Grove argues that even if its pricing claims fall within the settlement agreement, the claims may still proceed because MMR induced Ash Grove to sign the settlement agreement by fraud. MMR argues that Ash Grove knew about the overcharges—and almost the exact amount of them—when it signed the agreement, and that the *amount* of the overcharges, rather than their cause, is what matters.

To show fraudulent inducement in Arkansas, Ash Grove must show the following:

1. That the fraud was material to the contract; that it related to some matter of inducement to the making of the contract;

2. That it worked an injury;

3. That the relative position of the parties and their means of information are such that one party must necessarily be presumed to contract upon its faith in the statements of the other; and

4. That the injured party relied upon the fraudulent statements of the other, and that he had a right to rely on them.

*Cardiac Thoracic & Vascular Surgery, P.A. v. Nat'l Banking Corp.*, 310 Ark. 798, 806, 840 S.W.2d 188, 192 (Ark. 1992) (quoting *Ballard v. Carroll*, 2 Ark. App. 283, 286–87, 621 S.W.2d 484, 486 (Ark. Ct. App. 1981)).

In this case, MMR's fraud was the reason for the dispute that motivated its agreement with Ash Grove. Thus, the first element is met. The remaining elements, however, are not met in this case. The Court finds that Ash Grove knew enough about MMR's allegedly fraudulent scheme when it signed the settlement agreement to preclude a fraudulent-inducement claim.

### a. Ash Grove's knowledge

When Ash Grove signed the settlement agreement on January 25, 2010, it had a "duty to exercise reasonable diligence in examining the agreement…." *Alexander v. Flake*, 322 Ark. 239, 247, 910 S.W.2d 190, 194 (Ark. 1995). Ash Grove knew the general overcharge amounts, so the specific question is whether Ash Grove knew the *cause* of the overcharges. If Ash Grove knew or should have known that the overcharges were caused by MMR's fraud, then its fraudulent-inducement claim fails, because in that event there was no inducing misrepresentation at all.

The undisputed facts show the following. "In the summer of 2009, Ash Grove first noticed that the billing MMR was submitting for Summit and CSR appeared to be higher than estimated costs." (ECF No. 213, at 10). Ash Grove brought its concerns to MMR and in October 2009 received from MMR a pricing report explaining MMR's billing. (ECF No. 213, at 10).

In an October 29, 2009 letter, however, Ash Grove told Teton that it found MMR's responses to its pricing concerns "to be inadequate." (ECF No. 201, Ex. D). The letter further noted that at least one part of MMR's explanation was "troubling." Finally, Ash Grove's letter stated that "[t]he specific questions, issues and concerns about the invoice documentation Ash Grove has received to date regarding MMR's material and labor charges are well known and need not be repeated here." Based on its apprehension about MMR's billing, Ash Grove withheld $2.5 million from its October 30, 2009 payment to Teton.

Ash Grove, Teton, and MMR met on December 4, 2009 at Ash Grove's headquarters to discuss the billing issues. The meeting notes of Fran Streitman, Ash Grove's vice president, reveal his continuing suspicion about the reasons for MMR's overbilling. (ECF No. 201, Ex. E). The notes refer to "troubling" matters uncovered by Ash Grove's internal audit.

Meanwhile, Ash Grove was receiving behind-the-scenes information from Michael Comstock, an ex-MMR employee. In late 2009, Comstock called Craig Southworth, a

8

mechanical engineer for Ash Grove, and asked to meet with Ash Grove. During the short call, Comstock referred to embezzlement by MMR on the project. (ECF No. 213, at 13). In early January 2010, Southworth and Ralph Jones, Ash Grove's site manager, met with Comstock on the jobsite. (ECF No. 213, at 13). The meeting was conditioned on Comstock being protected from prosecution and from returning his benefits from the scheme.

At the meeting, Comstock admitted being a thief and a cheat who was approaching Ash Grove because MMR fired him. Comstock told Southworth and Jones that MMR had conspired with suppliers to inflate material charges. Comstock gave Southworth and Jones a handwritten list of materials that presumably were overbilled. Southworth and Jones were skeptical about the note because it was handwritten and because Comstock would not let them see other documentary evidence he claimed to have. Southworth and Jones did, however, take Comstock's claims seriously enough to report them to Ash Grove's corporate office and recommend that it follow up on Comstock's information. Ash Grove therefore hired Michael West, a private investigator, to interview Comstock and gather more information. On January 25, 2010, the same day West was conducting his first interview with Comstock, Ash Grove signed the settlement agreement with MMR and Teton.

On this evidence, the Court finds that when Ash Grove signed the settlement agreement, it knew or reasonably should have known that MMR's overbilling was a result of fraud. Ash Grove audited MMR's billing and knew MMR was overcharging. It knew nearly the exact amount of MMR's overcharges. It found MMR's explanations "troubling." It retained its suspicion at the December 2009 meeting. It was approached in late 2009 by an ex-MMR employee who alerted them to potential MMR fraud. And it took the ex-employee's allegations seriously enough to pass them all the way to corporate headquarters and hire an investigator to follow up. All of this happened before the settlement agreement was signed on January 25, 2010.

Ash Grove did not need detailed knowledge of the fraud scheme. It is enough that it "knew or should have known." Based on the above information, Ash Grove should have known of MMR's alleged fraud. The positions of Ash Grove and MMR and their relative information was not such that Ash Grove "must necessarily be presumed to contract upon the faith reposed in the statements of" MMR. *Cardiac Thoracic & Vascular Surgery, P.A.*, 310 Ark. at 806, 840 S.W.2d at 192. Ash Grove knew the approximate overcharge amount, and it had reason to know the cause. Therefore, the Court finds that Ash Grove was not fraudulently induced to sign the settlement agreement. The agreement is thus binding and effective. Accordingly Ash Grove's material-pricing claims are barred by the January 2010 settlement agreement.

## CONCLUSION

For the above reasons, MMR's Motion for Summary Judgment (ECF No. 201) should be and hereby is **GRANTED IN PART** and **DENIED IN PART**. Ash Grove's material-quantity claims, i.e., the claims that MMR billed for undelivered materials, may proceed. Those claims are not covered by the settlement agreement. However, Ash Grove's material-pricing claims, i.e., the claims that MMR overbilled for delivered items, may not proceed. Those claims are covered by the binding settlement agreement, and are **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED, this 3rd day of August, 2012.

/s/ Susan O. Hickey
Hon. Susan O. Hickey
United States District Judge